## FRANK C. BERTELMANN AND LINCOLN L. McCANDLESS *v.* MARY N. LUCAS, ET AL.

### No. 1788.

ARGUED APRIL 17, 18, 1928.              DECIDED JUNE 28, 1928.

BANKS, J., CIRCUIT JUDGE ROSS IN PLACE OF PERRY, C. J., DISQUALIFIED, AND CIRCUIT JUDGE MASSEE IN PLACE OF PARSONS, J., DISQUALIFIED.

OPINION OF THE COURT BY BANKS, J.

This is an action of ejectment. The lands involved are situate on the Island of Kauai. The case was tried by the circuit court, jury waived. Judgment was rendered against the plaintiffs and in favor of the defendants and the former bring the case here on writ of error.

The common source of title is the last will and testament of Christian Henry Bertelmann, the father of Frank C. Bertelmann, one of the plaintiffs. This will was executed on the 12th day of December, 1891, and the

testator died on March 15, 1895. It appears from the will that at the time of its execution the lands in question were under lease to the Kilauea Sugar Company for a term of twenty-five years, beginning on November 1, 1890, and ending on November 1, 1915. The rents from these lands, amounting to six thousand dollars per annum, were bequeathed to the wife and children of the testator in the following proportions: Two thousand dollars per annum to the wife and the remaining four thousand in equal proportions to the children. The lands themselves were devised as follows:

"*Third.* At the expiration of the 25 years lease with the Kilauea Sugar Co. it is my sincere wish and *will* that my lands shall befall in equal shares and interest upon my three sons: *Frank Charles; Henry Godfrey* and *Christian Sylvester Bertelmann* or then surviving sons or son. Provided however that at such a time these my sons or son shall pay to each one of my daughters or surviving daughters the sum of five thousand *Dollars* $5000.00. In case one or two of my sons should be at that time, or within a year from that time unable to furnish, produce or raise the necessary amount to pay to each one of my daughters or surviving daughters his share of the $5000.00 per capita, the two or the one of my sons will have a right to buy the whole of my lands now leased to the K. S. Co. by paying:

"1 ♀. to each of my daughters or surviving daughters the amount aforesaid of $5000.00.

"2 ♀. to my shortcoming son or sons the same amount of $5000.00 each, being the same share as will be paid to my daughters. By doing so, they my sons or he my son will enter in full possession of all my lands; and their or his right and title will be undisputable, provided they or he (my sons or son) comply and fulfill the above mentioned conditions.

"3 ♀. To my wife Susan Bertelmann a life rent of $2000.00 per annum. I make the payment of all these amounts above given a charge upon all my estate.

"*Fourth.* Should *none* of my sons be able to pay these

amounts, then my lands will be sold at public auction, or leased over again, according to circumstances and best advantage of my family. The money deriving from said sale or lease will be equally divided amongst my children or their lawful heirs and assigns after the distributive share of dower will have been given to my wife Susan Bertelmann according to law."

The widow of the testator died in September, 1915, and her interest in the estate being for her life only was thus terminated and need not therefore be further considered. Catherine, one of the testator's daughters, who had become the wife of Frank Scott, died in 1905 and the one-ninth interest in the lands involved in this suit that was devised to her by her father's will passed by descent to her heirs at law. These heirs, who now claim title to this interest, were made parties defendant herein and the Bishop Trust Company, as their guardian and as trustee of two of them, was also made a party defendant.

All of the children of the testator other than Catherine are still alive. Each of these children, except the plaintiff Frank C. Bertelmann, conveyed by deed to Mary N. Lucas, one of the defendants, his or her entire interest in the lands in question and all rights and privileges connected therewith. These deeds were executed subsequent to the death of the testator but prior to the termination of the lease to the Kilauea Sugar Company and none of the grantors now claims nor has since claimed any interest in or right or privilege connected with the lands embraced in the lease. It is on these deeds that Mary N. Lucas bases her claim of title to seven-ninths of the lands. She claims title to the one-ninth interest that was devised by the will of Christian Henry Bertelmann to the plaintiff Frank C. Bertelmann through another source. Her claim to this interest will be considered later. The Kilauea Sugar Company and the Kilauea Sugar Plantation Com-

pany, which are also parties defendant, claim no interest in the lands except as lessees of Mary N. Lucas and Charles Lucas.

It will be observed from the first and fourth items of the will of Christian Henry Bertelmann that while each of the six daughters of the testator took a vested remainder in fee to a one-ninth interest in the lands then under lease to the Kilauea Sugar Company, this interest, under the third item of the will, was subject to defeasance upon the payment to each of the daughters by the sons, or one or more of them, of the sum of five thousand dollars. (*Bertelmann* v. *Kahilina,* 14 Haw. 378.) The right or option to make these payments, upon which the defeasance depended, by the terms of the will did not come into existence until the Kilauea Sugar Company lease expired and likewise, by the terms of the will, it was lost unless the payments were made within a year following the termination of the lease. It is undisputed that two of the sons, Henry Godfrey and Christian Sylvester, have never made or offered to make any of these payments. Their right to make them, therefore, has long since been foreclosed.

Under the 2d item of the third clause of the will the interests of shortcoming sons were placed on the same footing and subject to the same defeasance as the interests of the daughters. That is to say, if Henry Godfrey and Christian Sylvester could not make the payments to the daughters and Frank could make them and could also make payments in the same amount to the two shortcoming sons, he would acquire the interests of the daughters and also the interests of the shortcoming sons and thereby become the owner in fee of all the lands.

This brings us to the first contention of Frank C. Bertelmann, one of the sons of Christian Henry Bertelmann, and one of the plaintiffs herein. This contention

is that within the time provided by his father's will he fully performed the conditions upon which the defeasance of the respective interests in the lands that were devised to his sisters and his two shortcoming brothers depended and that by such performance the fee simple title became vested in him. More specifically his contention is that on the 30th day of October, 1916, and prior to the expiration of the year following the termination of the Kilauea Sugar Company lease he tendered to Mary N. Lucas, the grantee of his five sisters and his two brothers, the sum of thirty-five thousand dollars and to the Bishop Trust Company, the legal representative of the heirs of his deceased sister Catherine, the sum of five thousand dollars, and that these tenders were refused.

It is not denied that a tender was made on the date mentioned to Mrs. Lucas through her husband and agent, Charles Lucas, and to the Bishop Trust Company, as the legal representative of the Scott heirs. Nor is it denied that the tenders were refused. Likewise the sufficiency of the *amounts* tendered is not denied. It is also not denied that the tenders were made within the time prescribed by the will. It is denied, however, that the tenders accomplished the purpose claimed by the plaintiffs. The grounds upon which this denial is based will be considered later.

The circumstances under which the money that was tendered was produced and those under which the tenders were made were as follows: On October 30, 1916, the day the tenders were made, Frank C. Bertelmann, being without funds, became a co-signatory with L. L. McCandless, Noa Aluli and John C. Lane of an instrument in writing under which McCandless agreed to make payment or tender of forty thousand dollars, required by the will of Christian Henry Bertelmann, to the brothers and sisters of Frank C. Bertelmann, or to Mary N. Lucas, the

assignee of said brothers and sisters, and to the Bishop Trust Company, guardian of the Scott heirs. The consideration which moved McCandless to make this agreement was either a conveyance by Bertelmann, contained in the written instrument itself, to him (McCandless) of an undivided four-ninths interest in the lands involved in the instant suit or an agreement to convey such interest.

For reasons which we shall presently explain we think it is immaterial whether the written instrument was intended as a conveyance or an agreement to convey. Aluli agreed to act as Bertelmann's counselor and attorney in whatever steps or proceedings were necessary to be taken in order to obtain for Bertelmann the fee simple title to the lands. Lane seems to have agreed to assist Aluli. The consideration that moved Aluli and Lane to make their agreement was the conveyance to them by Bertelmann of an undivided two-ninths interest in the lands. After this agreement was signed McCandless borrowed forty thousand dollars in gold coin of the United States from the First National Bank of Hawaii on his own note, had it placed in canvas bags and proceeded in an automobile with Bertelmann, Aluli and a representative from the bank to the Lucas home at Niu. Arriving there Bertelmann, Aluli and the representative from the bank went into the house and tendered thirty-five thousand dollars to Charles. Lucas, the husband and agent of Mary N. Lucas. The tender was refused. Thereupon Bertelmann, Aluli and the bank representative returned to the automobile where McCandless was waiting and proceeded to the office of the Bishop Trust Company where a tender of five thousand dollars was made to the Bishop Trust Company as the guardian of the Scott heirs. This tender was also refused.

It is contended by Mrs. Lucas that the tender to her was ineffectual to divest title out of her for the reason

that she was not the proper person to whom the tender should have been made, her claim in this regard being that under the terms of Christian Henry Bertelmann's will and under the law tenders should have been made to the brothers and sisters of Frank Bertelmann. For reasons that will later become apparent we think this contention may be laid aside.

It is contended by all the defendants that the tenders were unavailing for the reason that they were made with money that belonged to McCandless and not to Frank Bertelmann. Assuming but not deciding that the money was the property of McCandless we think this fact alone would not have rendered the tenders invalid. There is nothing in the will before us that expressly or by fair implication limits the performing son to the use of his own money in making the payments to the daughters and shortcoming sons. It may be that the testator hoped his performing son or sons would acquire the money by his or their own industry and frugality but he made no such requirement. If instead of obtaining permission to use McCandless's money for the purpose of making the tenders Frank Bertelmann had stolen the money, we find nothing in the will that would have justified a refusal to accept it because it had been obtained unlawfully and was therefore not his money.

It is also contended by the defendants that the tenders were invalid because in making them Frank Bertelmann sought to accomplish a result that was entirely at variance with and opposed to his father's intention as expressed in his will.

However unnecessary it may have been for Frank Bertelmann to use his own money in making the tenders, it was nevertheless essential for him to make them for the purpose of accomplishing the result contemplated by the testator. This was absolutely vital to the validity of

any tender he might make, whether of his own money or that of some one else. In other words, if an acceptance of the tenders would have resulted in something that was contrary to the testator's intention, they were worthless and were properly refused.

What end then did Christian Henry Bertelmann have in view when he authorized his sons, or such of them as were able to do so, to make the payments that would defeat the title vested by his will in his daughters and shortcoming sons? It seems clear from the language of the will that his primary intention was that all the lands that were under the Kilauea Sugar Company lease should befall his sons or such of them as could make the required payments. In the first sentence of the third clause of his will the testator said: "At the expiration of the 25 years lease with the Kilauea Sugar Co. it is my sincere wish and *will* that my lands should befall in equal shares and interest upon my three sons: Frank Charles; Henry Godfrey and Christian Sylvester Bertelmann or then surviving sons or son." Again, in the 2d item of this clause, he said: "By doing so," that is, by making the payments, "they my sons or he my son will enter in full possession of all my lands; and their or his right and title will be undisputable." The intention of the testator that these lands should become *actually* the property of his performing sons or son could hardly have been more clearly expressed. He added emphasis to this intention by making the right to defeat the title of his daughters and shortcoming sons *personal* to his performing sons or son. He guarded against its transfer or assignment. No stranger could exercise it. It must be exercised by the performing sons or son alone. (*Lucas* v. *Scott,* 239 Fed. 450.)

If the right to defeat the title of the daughters and shortcoming sons could not be exercised by a stranger

claiming to have acquired it by assignment, could it be exercised by a son on behalf of such stranger? Manifestly not. Such a course would be a palpable and unwarranted evasion and circumvention of the intention of the testator and would accomplish nothing. If, for instance, Frank Bertelmann had conveyed all his right, title and interest in the lands to McCandless and all his rights and privileges appertaining thereto and had afterwards made the tenders he made in the instant case, such tenders would not have been made in his own behalf and for the purpose of purchasing for himself the interests Mary N. Lucas had acquired from his brothers and sisters, and the Scott heirs had acquired by descent from their mother, but in behalf of McCandless and for the purpose of purchasing these interests for McCandless.

It may be that if under these circumstances the tenders were accepted the bare legal title to the lands would in a purely formal and technical sense momentarily vest in Frank Bertelmann. The lands themselves, however, would not in any real sense become his property. They would become the property of McCandless. Bertelmann would be a mere conduit through which the title passed to McCandless. We think this is not the sense in which Christian Henry Bertelmann wished and willed that the lands should "befall" or become the property of a performing son. If he had not intended to prevent a stranger from becoming, either directly or deviously, the beneficiary of the defeasance of the interests devised to his daughters and shortcoming sons he would not have guarded against the assignment of the right to accomplish the defeasance.

But Frank Bertelmann at the time the tenders were made to Mrs. Lucas and the Bishop Trust Company had not conveyed or agreed to convey to McCandless his entire interest in the lands. He had, however, either conveyed or agreed to convey to him a four-ninths interest and to

Aluli and Lane a two-ninths interest. This left undisposed of by Bertelmann or contracted to be disposed of two-ninths of the eight-ninths interest that was subject to the defeasance clause of his father's will. So that in making the tenders Bertelmann sought to purchase from Mrs. Lucas and the Scott heirs four-ninths of their interests for the benefit of McCandless, two-ninths for the benefit of Aluli and Lane and two-ninths for his own benefit.

As we have already concluded, we gather from the will of Christian Henry Bertelmann that it was not his intention that either strangers, or a son acting in behalf of strangers, should exercise the right to defeat the title vested by his will in his daughters and shortcoming sons. It cannot be denied, of course, that Mary N. Lucas occupies the same position and is entitled to the same construction of the will as her grantors, had they retained their interests. Nor can it be denied that the Scott heirs are in the same position and entitled to the same construction of the will as their mother, had she lived. When Mrs. Lucas and the Scott heirs acquired their interests, the one by purchase and the others by inheritance, they also acquired the right of their immediate predecessors in interest to a strict performance of the conditions upon which the defeasance of their title depended.

The tenders, therefore, for the foregoing reasons, being ineffectual to divest title out of Mrs. Lucas and the Scott heirs to six-ninths of their interests, were they any less unavailing to divest the title to the two-ninths interest which was undisposed of by Frank Bertelmann? In other words, could Frank Bertelmann, under the terms and spirit of his father's will, by tendering the sum of ten thousand dollars for the purpose of purchasing for himself two-ninths of the interests held by Mrs. Lucas and the Scott heirs, defeat their title to such interests with-

out also tendering the additional amount of thirty thousand dollars necessary to purchase their entire interests? We find nothing in the will that justifies an affirmative answer to this question.

After devising a one-ninth interest in the lands in fee to each of his daughters and each of his sons the testator proceeded to formulate a scheme under which at least one of his sons might acquire the interest of each of his daughters and the interest of each of his shortcoming sons and thus become the absolute owner of *all* the lands. It was his wish, of course, that all three of his sons might be able to avail themselves of the privilege given by this scheme. Realizing, however, that all might not be able to do so but that one might, the privilege was given the one who was able.

What was this privilege? Was it to acquire only a fractional part of the lands by paying five thousand dollars to some of the daughters and some of the shortcoming sons, leaving the remaining interests in the daughters and sons to whom they were devised? On the contrary, was it not the intention of the testator to require a son, who was able and willing to avail himself of the privilege, to purchase all the lands and not merely a portion of them by paying to each, that is, to every, daughter and to each shortcoming son the sum of five thousand dollars? The latter seems to be in accord with the terms of the will. After expressing his wish and will that after the termination of the Kilauea Sugar Company lease his lands should befall upon his sons, the testator declared as follows: "Provided however that at such a time these my sons or son shall pay to each of my daughters or surviving daughters the sum of five thousand dollars $5000.00. In case one or two of my sons should be at that time, or within a year from that time unable to furnish, produce or raise the necessary amount to pay to

each one of my daughters or surviving daughters his share of the $5000.00 per capita, the two or the one of my sons will have a right to buy the whole of my lands now leased to the K. S. Co. by paying: 1 º. to each of my daughters or surviving daughters the amount aforesaid of $5000.00. 2 º. to my shortcoming son or sons the same amount of $5000.00 each, being the same share as will be paid to my daughters. By doing so, they my sons or he my son will enter in full possession of all my lands." If it had been the intention of the testator that a performing son should have the privilege of purchasing a portion only of the interests that were subject to defeasance, he would have expressed himself very differently. He would have provided for the purchase of such a proportion of the lands as the performing son could pay for. This he did not do.

Moreover, circumstances are conceivable under which a different construction of the will might have resulted in an advantage to some of the daughters and shortcoming sons that was not intended by the testator. For instance, if the daughters and shortcoming sons had retained their interests and, when a son was ready and able to purchase said interests under the defeasance clause of the will, the lands had become so valuable that the interest of each daughter and shortcoming son was worth a great deal more than five thousand dollars, how easy it would have been for the performing son, who desired to treat some of his sisters and brothers more generously than others, to compel the disfavored ones to give up their interests for an inadequate consideration while permitting the favored ones to keep theirs. This discrimination, unauthorized by the testator, could only have been prevented by so construing the will as to require the son, who was able and willing to exercise his privilege, to purchase the interests of all his sisters and shortcoming brothers and not merely the interests of some of them.

As we have already observed, Mrs. Lucas and the Scott heirs are entitled to the same construction of the will to which the daughters and shortcoming sons would have been entitled had they not conveyed their interests.

The conclusions which we have thus far reached make it unnecessary for us to pass upon the defendants' contention to which we have earlier referred, that the tender which was made to Mrs. Lucas should have been made to Frank Bertelmann's brothers and sisters instead. If the tender had been made to these brothers and sisters instead of to Mrs. Lucas it would have been afflicted with the same infirmities as was the tender to her and would therefore have been equally unavailing.

It is contended by the plaintiffs that however imperfect in law or in fact Frank Bertelmann's tender to Mrs. Lucas may have been, she is estopped from asserting such imperfection for the reason that through her husband and agent, Charles Lucas, she had, before such tender was made, fraudulently prevented or attempted to prevent Bertelmann from obtaining, from persons other than McCandless, the money necessary to purchase the interests in the lands which she had acquired from the sons and daughters of Christian Henry Bertelmann and that such fraud, under the law, in and of itself divested her of her title. The trial court in its decision made the following statement: "Frank's version of the sheriff's sale situation is further corroborated by the activity of Mr. Lucas in 1916 to prevent Frank raising any money to make the tender and in the attempts to prevent the making of tenders on the Lucases by their absence from their normal places of abode in the latter part of October, 1916." The meaning of this statement is not entirely clear. It obviously was not made while the court was considering the question of tender or the effect that Lucas's interference with Bertelmann, in his efforts to raise the money neces-

sary to purchase her interest in the lands, might have on the tender he made to her. It was made while the court was considering the conflicting testimony of Frank Bertelmann and Charles Lucas on another and wholly unrelated phase of the case (a phase which we shall discuss later) and was an expression of its reasons for believing Bertelmann rather than Lucas.

Whether the court intended, by that portion of the statement which refers to "the activity of Mr. Lucas in 1916 to prevent Frank raising any money to make the tender," to make a solemn finding of fact that Lucas had accomplished or attempted to accomplish such a result and thereby had committed a fraud upon Bertelmann is, in view of the circumstances under which this statement was made, somewhat uncertain. Assuming, however, that this was the court's intention, the only basis for such finding, so far as the record discloses, was the testimony of Frank Bertelmann that, prior to his arrangement with McCandless, he had attempted to get the money from an uncle on Kauai and also from Walter Dillingham but had failed. Neither the circumstances under which he sought to obtain the money nor the reason for the refusal of the uncle and Dillingham to let him have it are disclosed. There was also the uncontradicted testimony of Noa Aluli that on the 31st day of October, 1916, Charles Lucas (who was the husband and agent of Mrs. Lucas) stated to him at McCandless's office in Honolulu that if he (Lucas) had known that Mc-Candless was going to advance the money he would have stopped him as he had stopped others. Without some strengthening evidence we think this is too weak a support for the weight the plaintiffs seek to impose upon it.

Before the trial court could properly find from the evidence that Mrs. Lucas through her agent had perpetrated on Frank Bertelmann the fraud claimed by the plaintiffs it

would be necessary for it to assume as a fact that Bertelmann had attempted to obtain money from his uncle or Dillingham or someone else under circumstances and conditions that would have enabled him, had he been successful, to make tenders that were free from imperfections and that were in compliance with his father's will. If, for instance, the plan under which Bertelmann undertook to get the money from his uncle or Dillingham was the same or a similar plan to that under which he afterwards got it from McCandless it would be illogical to hold that the frustration or attempted frustration of the plan by Mrs. Lucas would divest her of her interest in the lands. Under such circumstances Bertelmann's situation would be the same whether he got the money or did not get it. In the event he did not get it he could have made no tender of it and in the event he did get it he could have made a tender of it, but, for the reasons we have already given, such tender would have been barren of results. If Mrs. Lucas prevented or attempted to prevent Bertelmann from raising money with which he would have been enabled to make valid tenders to her and the Scott heirs, the burden was on him to prove it. Such conduct on her part would be a fraud on Bertelmann which might carry with it serious consequences. Fraud is never presumed. It must be proven either by direct evidence or by the proof of facts from which it can be reasonably inferred. There was no direct evidence that Mrs. Lucas, through her agent or otherwise, prevented Bertelmann or attempted to prevent him from raising money with which he could have made *valid* tenders, nor is it reasonably inferable from the facts that were proven that she did so. If the court below reached a different conclusion it was not based on substantial evidence amounting to more than a scintilla and is therefore not binding upon this court.

It is contended by the defendants that even if Mrs.

Lucas did, under circumstances that rendered her conduct fraudulent, prevent Bertelmann from raising the money, such fraud would avail the plaintiffs nothing. This contention is based on the hypothesis that Frank Bertelmann's position would be exactly the same as if he had made a tender of money to Mrs. Lucas. More specifically, the defendants claim that Frank Bertelmann could not, under the defeasance clause of his father's will, have acquired Mrs. Lucas's interest in the lands unless he also acquired the interest of the Scott heirs, and, inasmuch as the Scott heirs were not guilty of fraud which would divest their title nor was their interest acquired by a valid tender of money, therefore Bertelmann could not possibly have acquired Mrs. Lucas's interest, whether by her fraudulent interference with his plans to raise money with which to make tenders or by actually making a tender to her. In view of our conclusion that there is nothing in the evidence which tends to show that Mrs. Lucas did anything that rendered it unnecessary for Bertelmann to make a valid tender to her we need not pass on this contention.

We come now to the final feature of this case, namely, the one-ninth interest in the lands that was devised by Christian Henry Bertelmann to the plaintiff Frank Bertelmann. On the 13th day of August, 1902, Frank Bertelmann mortgaged this one-ninth interest to Mary Lucas for a recited indebtedness of $9,845. This indebtedness has never been paid nor has the mortgage been foreclosed. On November 3, 1902, a judgment was rendered against Bertelmann by the district court of Honolulu, at the suit of the Washington Mercantile Company, Limited, for the sum of $80.12. In due course execution was levied on Bertelmann's said one-ninth interest and on February 7, 1903, it was sold by the sheriff at public auction for the purpose of satisfying the judg-

ment.  At the sale Charles Lucas, acting for his wife, Mary Lucas, became the purchaser and on the 7th day of February, 1903, Mary Lucas received a sheriff's deed conveying to her Bertelmann's one-ninth interest.

The court below found from the evidence, which was conflicting, substantially the following facts regarding the sale and the circumstances under which the deed was made to Mrs. Lucas:  On the day of the sale Bertelmann, while on his way to attend it for the purpose of paying the judgment against him and preventing the sale, met Charles Lucas, the husband and agent of Mary Lucas, near the place where the sale was to occur.  At that time Bertelmann had on his person more than enough money to pay the judgment.  Lucas dissuaded Bertelmann from attending the sale and assured him that he (Lucas) would attend in Bertelmann's stead and would do whatever was necessary to protect Bertelmann's interests.  Relying on this assurance Bertelmann did not attend and immediately after the sale Lucas informed Bertelmann that everything was all right.  Lucas never informed Bertelmann of what he (Lucas) had done at the sale.  It was in connection with these findings that the court in its decision made the statement, to which we have referred, regarding Charles Lucas's activity in preventing Frank Bertelmann from raising the money with which to make the tenders.

It is not denied that these findings regarding the sale are supported by more than a scintilla of evidence and therefore binding on this court.  What is the effect of these facts on the sheriff's deed to Mary Lucas?  It is contended by the Lucases that at most they constituted constructive fraud that rendered the deed voidable merely and not void and that until canceled in a proper proceeding brought for that purpose it remained a valid conveyance and vested title in the grantee, which justifies her possession.  We cannot agree with this contention.

The fraud practiced by Lucas on Bertelmann was not constructive but actual. It was not fraud in law but fraud in fact and rendered the deed utterly void as a conveyance of Bertelmann's one-ninth interest in the lands. It was procured by a gross breach of the confidence which Lucas had persuaded Bertelmann to repose in him and was therefore void from its very inception and required no proceeding in equity to have it canceled. Bertelmann lost nothing by it and Mrs. Lucas acquired nothing. Evidence of its invalidity was properly admitted and considered in the instant action, which is an action at law.

Is Bertelmann, however, in view of the terms of the mortgage he executed to Mrs. Lucas and in view of the fact that he has long since defaulted in the payment of the mortgage debt, now entitled to recover possession of the one-ninth interest? We think he is not. In the clause of the mortgage specifying the rights of the mortgagee in the event the mortgagor defaulted in the performance of any of the obligations undertaken by him is that of entering and taking possession of the mortgaged premises. This right is emphasized, if emphasis were needed, by the following provision: "And it is agreed that * * * until default in the performance or observance of the condition of this deed I" (the mortgagor) "and my heirs and assigns may hold and enjoy the granted premises." It having been expressly stipulated between the parties that the mortgagor should retain possession *until default* and that *thereafter* the mortgagee might take possession, and the default having occurred and still continuing, we can conceive no sound theory upon which the mortgagor can in the instant case claim the right to possession. If he should hereafter pay the mortgage debt, together with accrued interest, his rights might be very different.

518

Questions other than those we have considered were presented and argued by counsel, but inasmuch as their determination would not in any way have affected the ultimate conclusion we have reached we pass them without decision.

The judgment of the circuit court is affirmed.

*U. E. Wild* and *N. D. Godbold* (*Heen & Godbold, Smith, Wild & Hoppe* and *J. G. Anthony* on the briefs) for plaintiffs in error.

*A. G. M. Robertson* (*Robertson & Castle* on the brief) for defendants in error Mary N. Lucas and Charles Lucas.

*H. L. Wrenn* (*Prosser, Anderson & Marx* with him on the brief) for defendant in error Kilauea Sugar Company.

*E. A. Mott-Smith* (also on the brief) for defendants in error Walter W. Scott, Janet M. Scott, Rubena F. Scott, and Bishop Trust Company.